# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

—————————————————————
                                                    )
GENE H. CARSWELL,                                   )
                                                    )
                    Plaintiff,                      )
                                                    )
        v.                                          )        Civil Action No. 07-651 (RBW)
                                                    )
AIR LINE PILOTS ASSOCIATION,                        )
INTERNATIONAL,  et al.,                             )
                                                    )
                    Defendants.                     )
                                                    )
—————————————————————   )


## MEMORANDUM OPINION

Gene H. Carswell, the plaintiff in this civil lawsuit, seeks "to remedy [alleged]

discrimination on the basis of age[] in violation of the Age Discrimination in Employment Act,

as amended, 29 U.S.C. §§ 62[1-34 (2000)] ([the] 'ADEA')," as well as alleged "breach of [the]

duty of fair representation and breach of contract" under the Railway Labor Act, 45 U.S.C.

§§ 151-88 (2000), by US Airways Group, Inc. ("US Airways"), the Air Line Pilots Association,

International (the "ALPA"), and the American Federation of Labor and Congress of Industrial

Organizations (the "AFL-CIO," and collectively with the ALPA the "Union Defendants").

Plaintiff's First Amended Complaint (the "Am. Compl.") ¶ 1.[1]  The plaintiff's claims arise out of

the "forced termination[]" of the plaintiff by US Airways in 2007, id., in accordance with a

—————————————

[1] The plaintiff styled his amended complaint as "a collective action" brought "on behalf of himself and other similarly situated individuals throughout the United States." Am. Compl. ¶ 1.  However, the Court denied the plaintiff's motion for class certification without prejudice in an order entered on August 10, 2007.  Thus, the only plaintiff in this proceeding at this time is Carswell.

federal regulation promulgated by the Federal Aviation Administration (the "FAA") that "bar[red] individuals who have reached their 60th birthday from serving as pilots or co[-]pilots in flight operations covered by [the regulation]," id. ¶ 9 (citing 14 C.F.R. § 121.383(c) (the "Age 60 Rule")). Specifically, "the [d]efendants [allegedly] refused to protect the [p]laintiff's employment status by retaining him . . . , supporting his [request for an exemption from the 'Age 60' Rule], or lobbying for a change to the Age 60 Rule." Id. ¶ 15. Consequently, the plaintiff "seeks declaratory and injunctive relief," as well as compensatory damages. Id. ¶ 1.

All three defendants have filed separate motions to dismiss the plaintiff's amended complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). US Airways Group, Inc.'s Rule 12(b)(6) Motion to Dismiss Plaintiff's Amended Complaint and Memorandum of Points and Authorities in Support Thereof (the "US Airways Mot.") at 1, Motion to Dismiss Pursuant to [Federal Rule of Civil Procedure] 12([b])(6) of Defendant Air Line Pilots Association, Int'l at 1, Defendant American Federation of Labor and Congress of Industrial Organizations' Motion to Dismiss Plaintiff's Amended Complaint at 1.[2] After carefully considering the plaintiff's amended complaint, the parties' motions, and all memoranda

---

[2] The AFL-CIO has also filed two motions for sanctions against the plaintiff pursuant to Federal Rule of Civil Procedure 11. See Defendant American Federation of Labor and Congress of Industrial Organizations' Motion for Sanctions Pursuant to [Federal Rule of Civil Procedure] 11 at 1 (requesting sanctions against the plaintiff based on the allegations set forth in the plaintiff's original complaint); Defendant American Federation of Labor and Congress of Industrial Organizations' Second Motion for Sanctions Pursuant to [Federal Rule of Civil Procedure] 11 at 1 (requesting sanctions against the plaintiff based on the allegations set forth in the plaintiff's amended complaint). The Court will address these motions in a separate memorandum opinion.

and exhibits relevant thereto,[3] the Court concludes for the reasons that follow that it must grant all three motions to dismiss.

## I. Background

The following facts are either alleged by the plaintiff in his amended complaint or are matters of public record. "The FAA first promulgated the Age 60 Rule in 1959 pursuant to its mandate under the Federal Aviation Act of 1958[, 49 U.S.C. §§ 40101-50105 (2000),] to ensure air safety." Prof.'l Pilots Federation v. Fed. Aviation Admin., 118 F.3d 758, 760 (D.C. Cir. 1997) (citing 24 Fed. Reg. 9767 (Dec. 5, 1959)). The rule provided in pertinent part that "[n]o certificate holder [could] use the services of any person as a pilot on an airplane engaged in operations under this part if that person ha[d] reached his 60th birthday," and that "[n]o person [could] serve as a pilot on an airplane engaged in operations under this part if that person ha[d] reached his 60th birthday." 14 C.F.R. § 121.383(c). Despite a litany of challenges to the

---

[3] In addition to the plaintiff's original complaint (the "Compl."), his amended complaint and the defendants' various motions cited above, the Court considered the following documents in reaching its decision: (1) the Plaintiff's Opposition to the Motion of US Airways Group, Inc. to Dismiss the First Amended Complaint Pursuant to Rule 12(b)(6) (the "Pl.'s Opp'n to US Airways Mot."), (2) the US Airways Group, Inc.'s Reply to Plaintiff's Response to Its Rule 12(b)(6) Motion to Dismiss Plaintiff's Amended Complaint and Memorandum of Points and Authorities in Support Thereof, (3) the Memorandum in Support of Motion to Dismiss Pursuant to [Federal Rule of Civil Procedure] 12([b])(6) of Defendant Air Line Pilots Association, Int'l (the "ALPA Mem."), (4) the Plaintiff's Memorandum in Opposition to the Motion to Dismiss Filed by the Air Line Pilots Association, International (the "Pl.'s Opp'n to ALPA Mot."), (5) the ALPA's Reply Memorandum in Further Support of the Motion to Dismiss Pursuant to [Federal Rule of Civil Procedure] 12([b])(6) of Defendant Air Line Pilots Association, Int'l (the "ALPA Reply"), (6) the Memorandum of Law in Support of Defendant American Federation of Labor and Congress of Industrial Organizations' Motion to Dismiss Plaintiff's Amended Complaint (the "AFL-CIO Mem."), (7) the Plaintiff['s] Memor[an]dum in Opposition to the Motion to Dismiss Filed by the American Federation of Labor and Industrial Organizations (the "Pl.'s Opp'n to AFL-CIO Mot.") and (8) the Defendant American Federation of Labor and Congress of Industrial Organizations' Reply Memorandum in Support of Its Motion to Dismiss Plaintiff's Amended Complaint (the "AFL-CIO Reply").

propriety of the Age 60 Rule both in this circuit and beyond,[4] the rule remained in effect for over forty years.

On December 13, 2007, Congress passed the Fair Treatment for Experienced Pilots Act, Pub. L. No. 110-135, 121 Stat. 1450 (2007), which amended 49 U.S.C. § 44729.  Under the amended § 44729, "a pilot may serve in multicrew covered operations until attaining 65 years of age," 49 U.S.C. § 44729(a), and the Age 60 Rule is no longer in effect, id. § 44729(e).  The amended statute also contains a non-retroactivity provision, which states that "[n]o person who has attained 60 years of age before the date of enactment of this section may serve as a pilot for an air carrier engaged in covered operations unless" the pilot was employed as a "required flight deck crew member" when the law went into effect or is "newly hired by an air carrier as a pilot" after the enactment of the law and receives no "credit for prior seniority or prior longevity for benefits or other terms related to length of service prior to the date of rehire under any labor agreement or employment policies of the air carrier."  Id. § 44729(e)(1).  The statute further provides that "[a]n action taken in conformance with . . . [14 C.F.R. § 121.383(c)]" when that regulation was still in effect "may not serve as a basis for liability or relief in a proceeding[] brought under any employment law or regulation[] before any court or agency of the United States or of any State or locality."  Id. § 44729(e)(2).

---

[4] See, e.g., Yetman v. Garvey, 261 F.3d 664, 667-79 (7th Cir. 2001) (rejecting challenge to the FAA's blanket rejection of all petitions for individual exemptions from the Age 60 Rule); Prof'l Pilots Federation, 118 F.3d at 762-70 (rejecting challenge to "the FAA's decision not to institute a rulemaking to repeal the Age 60 Rule" under the ADEA and the Administrative Procedures Act, 5 U.S.C. §§ 701-800 (2000)); Baker v. Fed. Aviation Admin., 917 F.2d 318, 319-23 (7th Cir. 1990) (rejecting challenge to order from the FAA denying requests for exemptions to the Age 60 Rule); Keating v. Fed. Aviation Admin., 610 F.2d 611, 612-13 (9th Cir. 1979) (same); Gray v. Fed. Aviation Admin., 594 F.2d 793, 794-95 (10th Cir. 1979) (same); Rombough v. Fed. Aviation Admin., 594 F.2d 893, 895-900 (2d Cir. 1979) (same); Starr v. Fed. Aviation Admin., 589 F.2d 307, 308-14 (7th Cir. 1979) (same); O'Donnell v. Shafer, 491 F.2d 59, 60-63 (D.C. Cir. 1974) (rejecting due process challenge to the Age 60 Rule); Air Line Pilots Ass'n, Int'l v. Quesada, 276 F.2d 892, 894-98 (2d Cir. 1960) (rejecting challenge to the Age 60 Rule under the Administrative Procedures Act and the Federal Aviation Act).

4

The plaintiff, "a resident of Hendersonville, North Carolina," Am. Compl. ¶ 61, was hired by US Airways, "a [c]orporation headquartered in Tempe, Arizona, but having major operations in Washington, D.C.," id. ¶ 1 in 1977, and remained a US Airways employee for 29 years, id. ¶ 62. At the time of his hiring, both the ALPA and US Airways warned the plaintiff "that he had to retire when he reached [age sixty]," id. ¶ 63, and mandatory retirement at the age of sixty is a provision of the collective bargaining agreement between the ALPA and US Airways (the "CBA"), id. ¶ 65. When the plaintiff reached his 60th birthday on January 12, 2007, id. ¶ 64, he "applied for an exemption [from the Age 60 Rule] . . . and asked US Airways not to terminate him," but "US Airways did not support the exemption request," id. ¶ 65. Instead, in conformance with the Age 60 Rule, which was still in effect at that time, US Airways "forced the [p]laintiff to retire on Feb[ruary] 1, 2007," id., which resulted in the plaintiff filing a "charge of discrimination against [the] ALPA, US Airways, and [the] AFL-CIO with the Equal Employment Opportunity Commission (the 'EEOC')." Id. ¶ 43.

The plaintiff filed his complaint in this Court on April 7, 2007, and filed an amended complaint on June 22, 2007. As set forth in his amended complaint, the plaintiff alleges that US Airways has "violated all standard norms associated with federal age discrimination laws" by "institut[ing] a policy that require[d] 99.9% of its pilots to retire from flying[] or be terminated[] by the first day of the month coincident with [(]or next following[)] the pilots' 60th birthday." Id. ¶ 3. He further alleges that the Union Defendants "colluded with US Airways to discriminate against US Airways pilots." Id. ¶ 5. Specifically, the plaintiff alleges that the Union Defendants "continue[d] to support the Age 60 Rule and . . . lobby against the pilots they [we]re supposed to be representing," id. ¶ 27, while "US Airways . . . refused to object to the Age 60 Rule, lobby

against the Age 60 Rule, or request exemptions from the FAA for the . . . [p]laintiff and other similarly situated employees," id. ¶ 26.

Based upon these allegations, the plaintiff asserts three causes of action against the defendants.[5]  First, he claims that the defendants "willfully violated the ADEA by discriminating on the basis of age knowingly and with reckless disregard of the law," id. ¶ 80, and by "engag[ing] in collusion to discriminate against the [p]laintiff and others similarly situated," id. ¶ 93.  Second, he claims that the Union Defendants breached the CBA "when they promoted an illegal age discrimination policy under the pretense of it being a 'safety measure.'"  Id. ¶ 99. Third, he claims that the Union Defendants breached their duties of fair representation owed to the plaintiff when they "conspired with US Airways to permit his discharge, failed to represent his interests, and took active steps to deprive him of his employment."  Id. ¶ 104.

US Airways filed a motion to dismiss the plaintiff's complaint on June 25, 2007.  In support of its motion, US Airways argues (1) that its adherence to the Age 60 Rule at the time of the plaintiff's termination could not have violated the ADEA, US Airways Mot. at 7-10, (2) that the ADEA does not compel employers to lobby or object to the application of federal law on behalf of their employees, id. at 10, and (3) that US Airways cannot be held liable for its failure to lobby for any changes to the Age 60 Rule without violating its First Amendment rights under the "Noerr-Pennington doctrine" established by the Supreme Court in Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961), and United Mine Workers v.

---

[5]  The plaintiff delineates eight counts for relief in his amended complaint; however, Counts II-III and VII-VIII are brought on behalf of a class or sub-class of plaintiffs, which the plaintiff cannot raise at this time.  See supra n.1.  The plaintiff also segregates his ADEA claim into two counts: one for the purportedly illicit discrimination of the defendants (Count I), Am. Compl. ¶¶ 78-80, and another (Count IV) for the alleged collusion of the defendants in perpetrating that discrimination, id. ¶¶ 92-94.

Pennington, 381 U.S. 657 (1965), id. at 10-12. The plaintiff counters that even if US Airways was justified in terminating the plaintiff's employment as an airline captain, it nevertheless violated the ADEA by failing to find an alternative position for him, Pl.'s Opp'n to US Airways Mot. at 4-7, and that US Airways either violated its own fiduciary duty to the plaintiff, id. at 7, or aided and abetted the Union Defendants' breaches of their fiduciary duties, id. at 8-10.

The ALPA filed a separate motion on July 18, 2007, seeking to dismiss all three of the plaintiff's claims against it. With respect to the plaintiff's ADEA claim, the ALPA incorporates the arguments raised by US Airways, noting that "if US Airways d[id] not violate the ADEA by following the Age 60 Rule . . . , then obviously [the] ALPA d[id] not violate the ADEA by allowing US Airways to follow the Age 60 Rule." ALPA Mem. at 4. The ALPA further asserts that its duty of fair representation owed to the plaintiff does not impose a duty to lobby or seek exemptions from the Age 60 Rule on behalf of its members, id. at 8-11, and that any imposition of liability based upon the breach of a duty to lobby would run afoul of the Noerr-Pennington doctrine, id. at 9-10. With respect to the plaintiff's breach of contract claim, the ALPA argues that, aside from its lack of merit, the claim is defective because the Railway Labor Act "mandates that all claims involving interpretation or application of collective bargaining agreements be submitted to a grievance adjustment process that culminates in arbitration." Id. at 12.

The plaintiff does not challenge the ALPA's characterization of the scope of its duty of fair representation in his opposition. See Pl.'s Opp'n to ALPA Mot. at 2-4 (asserting only that "there can be no dispute that [the] ALPA owes a duty of fair representation to all of its members," and that "[i]t will ultimately be up to the trier of fact to determine if [the] ALPA has breached its duty of fair representation to [the plaintiff]"); ALPA Reply at 2 ("the [plaintiff's]

opposition memorandum does not contest any of the points from our opening brief with respect

to the duty of fair representation").  Instead, he argues at length that the Noerr-Pennington

doctrine does not apply in this case, Pl.'s Opp'n to ALPA Mot. at 4-9, or that, at a minimum, the

plaintiff is entitled to discovery to demonstrate why the doctrine is inapplicable, id. at 9-10.  He

also contests the ALPA's argument that his breach of contract suit is subject to mandatory

arbitration, asserting that "only minor disputes must be referred to arbitration under the Railway

Labor Act," id. at 10 (emphasis in original), and that the "ALPA's [alleged] breach [of the CBA]

goes to the very heart of the contract between the parties," id. at 11.

     In addition to the arguments raised by the ALPA, the AFL-CIO argues in its separate

motion to dismiss that it was "not a signatory to the contract at issue," AFL-CIO Mem. at 4, and

therefore could not have breached that agreement nor "cause[d]" the plaintiff's termination as

required to state a claim under the ADEA, id. at 4-7.  The AFL-CIO further argues that it cannot

be held vicariously liable for any actions taken by the ALPA because it lacks the requisite control

over the ALPA to establish a principal-agent relationship between the two entities.  Id. at 7-10.

In his opposition to the AFL-CIO's motion to dismiss, the plaintiff avers that if he is permitted

discovery of the AFL-CIO's records, he will be able to verify that, inter alia, "the AFL-CIO did

not allow [the] ALPA to be autonomous," Pl.'s Opp'n to AFL-CIO Mot. at 6, thereby rendering

the AFL-CIO vicariously liable for the ALPA's violation of the ADEA, breach of the duty of fair

representation, and breach of contract, id. at 9-10, 13-16.  He also asserts "that the AFL-CIO had

an affirmative responsibility toward the plaintiff to provide a discrimination-free workplace," or,

"[a]t the very least, . . . a duty to intervene once the pilots alerted it of discriminatory treatment,"

id. at 9, and that all three defendants acted as an "integrated enterprise in administering, controlling, and perpetuating the [A]ge 60 retirement policy," id. at 11-13.

## II. Standard of Review

As the Court previously noted, all three defendants seek dismissal of all claims against them pursuant to Federal Rule of Civil Procedure 12(b)(6).  On a motion to dismiss under Rule 12(b)(6), the Court "must treat the complaint's factual allegations as true and must grant the plaintiff the benefit of all inferences that can be derived from the facts alleged."  Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006) (internal quotation and citation omitted).  Factual challenges are not permitted under Rule 12(b)(6), and the Court may only consider the facts alleged in the complaint, any documents attached as exhibits thereto (or incorporated therein), and matters subject to judicial notice in weighing the merits of the motion.  EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624-25 (D.C. Cir. 1997).  The Court's focus is therefore restricted to the facts as alleged by the plaintiff, which must be sufficiently detailed "to raise a right to relief above the speculative level."  Bell Atl. Corp. v. Twombly, ___ U.S. ___, 127 S. Ct. 1955, 1965 (2007).

## III. Legal Analysis

Given the plaintiff's concession that a union's duty of fair representation does not impose a duty to lobby or seek individual exemptions from federal rules,[6] his claims predicated on the

---

[6]  "It is understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."  Buggs v. Powell, 293 F. Supp. 2d 135, 141 (D.D.C. 2003) (Walton, J.).  The Court's authority to treat unopposed arguments as conceded derives from Local Civ. R. 7(b), which states as follows:

> Within 11 days of the date of service or at such other time as the court may direct,
> an opposing party shall serve and file a memorandum of points and authorities in

(continued...)

9

alleged breach of that duty by the ALPA and the AFL-CIO must be dismissed. Thus, the only

issues left for resolution by the Court are (1) whether the plaintiff states a valid claim under the

ADEA if, as he alleges, the defendants colluded to lobby against a change to the Age 60 Rule and

refused to seek an exemption from the rule on the plaintiff's behalf, and (2) whether the Court

can consider the plaintiff's claim for breach of contract against the Union Defendants (assuming

one exists) in light of the arbitration provisions of the Railway Labor Act. The Court considers

each issue in turn.

A.    ADEA Claims

         The ADEA provides in pertinent part that "[i]t shall be unlawful" for an employer to,

inter alia, "discharge any individual . . . because of such individual's age," 29 U.S.C. § 623(a)(1),

and that "[i]t shall be unlawful for a labor organization" to, inter alia, "cause or attempt to cause

an employer to discriminate against an individual in violation of this subsection," id. § 623(c)(3).

"In analyzing a discrimination claim under the ADEA, [courts] apply the framework developed

in the context of Title VII litigation." Hall v. Giant Food, Inc., 175 F.3d 1074, 1077 (D.C. Cir.

1999). This framework, first articulated by the Supreme Court in McDonnell Douglas Corp. v.

Green, 411 U.S. 792 (1973), requires the plaintiff to "establish a prima facie case of

discrimination" in the absence of direct evidence of discrimination, Reeves v. Sanderson

_____

[6](...continued)
                   opposition to the motion. If such a memorandum is not filed within the prescribed
                   time, the court may treat the motion as conceded.

(Emphasis added.) "Courts have interpreted this local rule to apply to specific arguments within a memorandum
opposing a motion," United States v. Real Property, 287 F. Supp. 2d 45, 61 (D.D.C. 2003) (Walton, J.), and the
District of Columbia Circuit "'ha[s] yet to find that a district court's enforcement of this rule constituted an abuse of
discretion,'" Buggs, 293 F. Supp. 2d at 141 (quoting FDIC v. Bender, 127 F.3d 58, 67-68 (D.C. Cir. 1997) (internal
citations omitted)). The Court therefore declines "to act as an advocate for [] [the parties] and construct their legal
arguments on [their] behalf in order to counter those in the motion to dismiss." Real Property, 287 F. Supp. 2d at 61
(internal quotation and citation omitted).

Plumbing Prods., 530 U.S. 133, 142 (2000), after which "the burden shifts to the defendant, who

must 'articulate some legitimate, non-discriminatory reason' for the adverse action.'" Czekalski

v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007) (quoting McDonnell Douglas, 411 U.S. at 802).

To make out a prima facie case for wrongful discharge in the ADEA context, the plaintiff must

"show that he belongs in the statutorily protected age group, he was qualified for the position, he

was terminated, and he was disadvantaged in favor of a younger person." Hall, 175 F.3d at 1077.

US Airways does not dispute that its retirement policy constitutes direct evidence of age

discrimination, obviating the need for the plaintiff to establish a prima facie case in the first

instance. Instead, it relies upon a statutory defense set forth in § 623 which provides that "[i]t

shall not be unlawful for any employer . . . or labor organization" to, inter alia, "take any action

otherwise prohibited under subsections (a), (b), (c), or (e) of this section where age is a bona fide

occupational qualification reasonably necessary to the normal operation of the particular

business." 29 U.S.C. § 623(f)(1) (emphasis added). The EEOC has expounded upon the

meaning of this so-called "BFOQ defense" as follows:

> An employer asserting a BFOQ defense has the burden of proving
> that (1) the age limit is reasonably necessary to the essence of the
> business, and either (2) that all or substantially all individuals
> excluded from the job involved are in fact disqualified, or (3) that
> some of the individuals so excluded possess a disqualifying trait that
> cannot be ascertained except by reference to age.

29 C.F.R. § 1625.6(b).[7]

---

[7] A defendant may raise an affirmative defense under Rule 12(b)(6) "when the facts that give rise to the
defense are clear from the face of the complaint." Smith-Haynie v. District of Columbia, 155 F.3d 575, 578 (D.C.
Cir. 1998). In this case, there is no question that US Airways' BFOQ defense applies based on the plaintiff's
allegation that he was terminated as a result of the Age 60 Rule. See Am. Compl. ¶¶ 8-9 (discussing the Age 60
Rule).

The Age 60 Rule would appear to qualify as a BFOQ defense for US Airways.  Indeed, the Sixth Circuit reached this precise conclusion in Coupé v. Fed. Express Corp., 121 F.3d 1022 (6th Cir. 1997).  The plaintiff in that case was an airplane captain for Federal Express who sued the company under the ADEA when it refused his demand to continue working in his current job after he turned 60 notwithstanding the requirements of the Age 60 Rule.  Id. at 1023-24.  On appeal from the district court's dismissal of the plaintiff's complaint under Rule 12(b)(6), the Sixth Circuit "agree[d] with the district court that the [A]ge 60 [R]ule provide[d] Federal Express a good defense to the [plaintiff's] ADEA claim as a matter of law."  Id.

In reaching its conclusion, the Sixth Circuit reasoned that although "the FAA has never expressly purported to establish a bona fide occupational qualification for ADEA purposes, . . . [it] performed the same sort of analysis that a court would undertake in determining the legitimacy of a BFOQ defense under the framework established by the EEOC regulation" in promulgating the Age 60 Rule.  Id. at 1024-25.  The court recognized that an "age 60 rule" might not "necessarily establish a BFOQ defense if a private employer adopted such an age limit voluntarily," but held nevertheless that Federal Express need not "adduce evidence in support of the rule and convince a judicial factfinder that an age limitation for its pilots is a BFOQ on its own merits[.]"  Id. at 1026.  The Sixth Circuit reasoned that such a factual inquiry was unwarranted because

> The employer's burden to make a particularized factual showing in support of its BFOQ defense is satisfied by demonstrating the existence of an age-based federal agency rule by which the employer is bound–at least where, as here, the rule has been adopted on grounds that could support a BFOQ defense had the age limit been adopted by the employer voluntarily. . . . Federal Express need not independently judge the soundness of the [A]ge 60 [R]ule.  Were it otherwise,

12

> Federal Express would be required to second-guess the very agency established by Congress to regulate it.

Id.

The Court finds the Sixth Circuit's reasoning entirely persuasive, although there appears to be no need to qualify its ruling by looking at the legitimacy of the FAA regulation that forced US Airways' hand.  The retirement age imposed by US Airways tracked a binding federal regulation that prevented certain targeted employees (i.e., commercial pilots age 60 and older) from doing the very tasks they had been hired to perform, making it all but impossible for US Airways not to compel its pilots to retire at age 60.  Moreover, "all or substantially all" of the individuals terminated under US Airways' mandatory retirement policy were "disqualified" from further employment by the Age 60 Rule, as the rule covered the exact same category of pilots (those age 60 and older) as the retirement policy at issue here.  Consequently, there can be no doubt that US Airways, having no choice but to follow the Age 60 Rule, is entitled to invoke the rule as a BFOQ defense without the need for inquiry into the scientific or even conceptual validity of the rule itself.[8]

The plaintiff attempts to distinguish Coupé because the employer in that case "offered [the plaintiff] another job as a flight engineer," Pl.'s Opp'n to US Airways Mot. at 6; see also Coupé, 121 F.3d at 1024 (noting that Federal Express gave the plaintiff in that case "a choice between retiring at age 60 or training for a lower-paying position as a flight engineer"), whereas

---

[8]  As the Sixth Circuit noted in its decision, the plaintiff's complaint in Coupé would have been better directed at the FAA than at Federal Express.  See Coupé, 121 F.3d at 1024 ("[The plaintiff] asks us to declare the [A]ge 60 [R]ule an invalid exercise of agency rulemaking power.  The FAA not being a party to this litigation, we are at a loss to understand how we could so.").  But in this Circuit, at least, it is clear that the Age 60 Rule did not violate the ADEA.  See Prof'l Pilots Federation, 118 F.3d at 763 ("We agree with the FAA that the ADEA places no substantive limitation upon the agency's authority to act as a regulator of the airline industry.").

"US Airways did not offer [the plaintiff] other employment," Pl.'s Opp'n to US Airways Mot. at

3.  The Court would be inclined to agree with the plaintiff on this point if he had applied for

another job for which he was qualified but was denied the position because of his age.  See

Western Air Lines v. Criswell, 472 U.S. 400, 417-23 (1985) (affirming jury verdict in favor of

former captains who were denied transfers to flight engineer positions based on the fact that they

were age 60 or older).  But as US Airways correctly notes, the "[p]laintiff does not allege . . . that

he applied for another position in US Airways, nor does he claim that he was qualified for

another position but was passed over due to age discrimination."  US Airways Mot. at 4; see also

ALPA Mem. at 5 n.2 (noting that the plaintiff "never alleges . . . that he sought any other

positions at US Airways, that he would have been qualified for any other positions, or that he

was rejected for other positions because of his age").  Instead, he suggests that US Airways

should have offered the plaintiff another position on its own initiative.  See Pl.'s Opp'n to US

Airways Mot. at 4 (arguing that US Airways violated the ADEA "by terminating [the plaintiff's]

employment completely").

Nothing in the language of the ADEA or the case law interpreting it suggests such a duty.

To the contrary, the District of Columbia Circuit has stated unequivocally that there is "no

requirement whatever in the ADEA that an employer seek to place in another position an

employee whose age brings him or her under the ADEA's protective shield when that employee

is being terminated for nondiscriminatory reasons."  Stacey v. Allied Stores Corp., 768 F.2d 402,

408 (D.C. Cir. 1985).  Courts in other circuits have reached similar conclusions.  See Barnes v.

GenCORP Inc., 896 F.2d 1457, 1469 (6th Cir. 1990) ("This Circuit has clearly established that

an employer has no duty under the ADEA to permit an employee to transfer to another position

14

or to displace workers with less seniority when the employee's position is eliminated as part of a work force reduction."); EEOC v. Sperry Corp., 852 F.2d 503, 509 (8th Cir. 1988) ("[T]he ADEA does not require special treatment for older workers . . . ."); Tice v. Lampert Yards, Inc., 761 F.2d 1210, 1217 (7th Cir. 1985) ("'The ADEA mandates that an employer reach employment decisions without regard to age, but it does not place an affirmative duty upon an employer to accord special treatment to members of the protected age group.'" (quoting Williams v. Gen. Motors Corp., 656 F.2d 120, 129 (5th Cir. 1981))).

The conclusions reached by the District of Columbia Circuit in Stacey and elsewhere apply with equal force here, where US Airways' termination of the plaintiff's employment, while perhaps discriminatory in a technical sense, is nevertheless required and therefore not in contravention of the ADEA. The principle applicable in both situations is the same: if an employer terminates its employees for reasons that do not run afoul of the ADEA, then its failure to find new positions for those same employees cannot run afoul of the ADEA, either. Indeed, "[i]f [US Airways] allowed captains disqualified by reason of age to [assume other positions], but not captains disqualified for other reasons, it would be discriminating in favor of captains disqualified by reason of age, and the age discrimination law does not require employers to discriminate against the young." Tice v. Am. Airlines, Inc., 288 F.3d 313, 315 (7th Cir. 2002) (emphasis in original).

The plaintiff further argues that "if US Airways continues to employ some pilots once they reach age 60, then it has an obligation to offer employment to all pilots who reach age 60 on the same basis as the pilots who continue their employment." Pl.'s Opp'n to US Airways Mot. at 5. This amounts to a wholly separate claim of discrimination nowhere to be found in the

plaintiff's amended complaint.  See Am. Compl. ¶¶ 2-3 (alleging that US Airways' "company-wide, mandatory retirement policy . . . based solely on age . . . violated all standard norms associated with federal age discrimination laws"); id. at ¶¶ 46-55 (alleging that the plaintiff's lawsuit should be certified as a class action suit on behalf of "all US Airways pilots who[, inter alia,] . . . were terminated or forced to retire before the age [of] 60 or upon reaching age 60" because "all pilots were[] subjected to the same company-wide retirement policy").  The plaintiff would therefore need to demonstrate at least a prima facie case of discrimination to succeed on this wholly separate and novel age discrimination claim.  Hall, 175 F.3d at 1077.  However, to make out a prima facie case of age discrimination with respect to US Airways' decision to retain some pilots who attain the age of 60, the plaintiff would need to show that he was "disadvantaged in favor of a younger person."  Id.  Obviously, the plaintiff could not make such a showing given that those few pilots retained by US Airways were the same age as the plaintiff. His attempt to resuscitate his ADEA claim against US Airways by comparing himself to other pilots his own age is therefore infirm from the outset.

Finally, the plaintiff's argument that US Airways' ability to seek an exemption for pilots from the Age 60 Rule somehow imposed fiduciary duties on US Airways, the breach of which constitutes a violation of the ADEA, is without precedent and plainly without merit.  As an initial matter, a claim for breach of a fiduciary duty is a common law cause of action under applicable state law,[9] not a claim arising under the ADEA.  See 29 U.S.C. § 623 (setting forth the criteria for

---

[9] "There is, of course, 'no federal general common law'" from which the plaintiff could derive a breach of fiduciary duty claim, Tex. Indus., Inc. v. Radcliff Materials, Inc., 451 U.S. 630, 640 (1981) (quoting Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938)), and in the "few and restricted" cases where "judicial creation of a special federal rule would be justified," there is almost always a "significant conflict between some federal policy or interest and the use of state law," O'Melveny & Myers v. FDIC, 512 U.S. 59, 87 (1994).  As no such conflict is apparent here, the
(continued...)

an age discrimination claim under the ADEA). The plaintiff does not so much as suggest a basis under the common law of any state for the recognition of any fiduciary duties owed by US Airways, much less articulate a basis for finding a breach of such duties under applicable common law. As noted above, the Court's proper role is to adjudicate the issues before it as articulated by the parties, not invent arguments out of whole cloth on one party's behalf. See supra n.6.

But even if the Court were inclined to assess the plaintiff's putative state law claim on its merits, the result would be the same. In accordance with the Restatement comment that "[a] fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation," Restatement (Second) of Torts § 874 cmt. a (1979), all three jurisdictions in this case that could possibly lay claim to being the source of controlling precedent on this point–Arizona,[10] North Carolina,[11] and the District of Columbia–recognize the existence of a fiduciary duty only where there is an unusual relationship between two or more parties that imposes special obligations on one or more parties in favor of another. Compare Geiger v. Crestar Bank, 778 A.2d 1085, 1095 (D.C. 2001) ("The existence of a fiduciary relationship would depend on whether the parties, through the past history of the relationship and their conduct, had extended the relationship beyond the limits of

---

[9](...continued)
Court must follow "the modern rule that the federal common law should be employed in the rarest of circumstances" and decline to recognize a federal common law claim for breach of a fiduciary duty arising out of the regulations promulgated by the FAA pursuant to the Federal Aviation Act. Vine v. Republic of Iraq, 459 F. Supp. 2d 10, 27 (D.D.C. 2006) (internal quotation and citation omitted).

[10] As the Court noted above, Tempe, Arizona is the location of the corporate headquarters for US Airways, thus making it one of the jurisdictions relevant to the Court's choice-of-law analysis. Am. Compl. ¶ 1.

[11] Because the plaintiff is a resident of Hendersonville, North Carolina, that state is also one of the jurisdictions relevant to the Court's choice-of-law analysis. Am. Compl. ¶ 62.

the contractual obligations." (internal quotation and citation omitted)) with Marketplace Antique

Mall, Inc. v. Lewis, 594 S.E.2d 121, 124 (N.C. Ct. App. 2004) ("A fiduciary duty . . . exists in all

cases where there has been a special confidence reposed in one who in equity and good

conscience is bound to act in good faith and with due regard to the interests of the one reposing

confidence." (internal quotations and citations omitted)) and Standard Chartered PLC v. Price

Waterhouse, 945 P.2d 317, 335 (Az. Ct. App. 1996) ("A fiduciary relationship is a confidential

relationship whose attributes include great intimacy, disclosure of secrets, or intrusting of

power." (internal quotation and citation omitted)).[12]  The plaintiff's amended complaint is bereft

of any allegations to that effect.

 The closest that the plaintiff comes to alleging facts that might give rise to a fiduciary

duty on the part of US Airways is his assertion that "the FAA ha[d] the authority to grant a

waiver or exemption to the Age 60 Rule if the pilot's airline ma[de] an exemption request on

behalf of a specific individual."  Am. Compl. ¶ 11.  But nothing in part 11 of the Code of Federal

Regulations, which sets forth the process for filing petitions for exemptions from agency

regulations, requires that a pilot's employer sponsor the pilot's exemption for the petition to be

eligible for review by the FAA.  See 14 C.F.R. § 11.71 (setting forth the information required to

submit a petition for an exemption from an agency regulation).  The fact that the FAA permitted

airlines to submit petitions for exemption on behalf of its employees did not therefore confer any

---

[12] "When deciding state-law claims under diversity or supplemental jurisdiction, federal courts apply the choice-of-law rules of the jurisdiction in which they sit."  Mastro v. Potomac Elec. Power Co., 447 F.3d 843, 857 (D.C. Cir. 2006) (internal quotation and citation omitted).  Employing the choice-of-law rules of this Court's forum (i.e., the District of Columbia), "the [C]ourt must first determine if there is a conflict between the laws of the relevant jurisdictions."  Young Women Christian's Ass'n of the Nat'l Capital Area, Inc. v. Allstate Ins. Co. of Canada, 275 F.3d 1145, 1150 (D.C. Cir. 2002).  Because the laws of the District of Columbia, North Carolina, and Arizona are not in conflict with respect to the prerequisites for the establishment of a fiduciary relationship, the Court need not determine which jurisdiction's law would be controlling in this instance.

special responsibility upon the airline to act on its employees' behalf because the petitioner could always have filed the petition himself (which the plaintiff did in this case). Consequently, US Airways had no fiduciary duty with respect to the plaintiff.

Further, the FAA announced in an order entered in 1995 that it would "deny any petition for exemption from the Age 60 Rule without first publishing it for comment unless it contain[ed] a proposed technique, not discussed in [prior sections of the order], to assess an individual pilot's abilities and risks of subtle and sudden incapacitation," and that "[p]etitions that d[id] not contain new information or a protocol that m[ight] allow the FAA to accurately assess the individual w[ould] be summarily denied." In re Meier, FAA Docket No. 27264, available at 1995 WL 749783 (Dec. 20, 1995) (emphasis added); see also Yetman v. Garvey, 261 F.3d 664, 668 (7th Cir. 2001) (upholding this ruling in the face of attempted challenge to the Age 60 Rule). The plaintiff does not identify any "new information" or "protocol" that US Airways could have submitted in connection with his petition for an exemption. Thus, even if US Airways had owed a fiduciary duty to the plaintiff and acted in derogation of that duty, its breach could not have caused any harm to the plaintiff because the plaintiff's petition would have been denied in any event.

In short, US Airways did not violate the ADEA when it followed the Age 60 Rule in terminating the plaintiff's employment. It did not owe any fiduciary duty to the plaintiff under federal or state common law, and even if it had owed such a duty, its failure to fulfill that duty could not have been the cause for the plaintiff's termination. The plaintiff's ADEA claim against US Airways is without merit under any theory advanced by the plaintiff and therefore must be dismissed.

This result also forecloses any relief under the ADEA against the Union Defendants. As the AFL-CIO correctly points out, the ADEA prohibits labor unions from, inter alia, "caus[ing] or attempt[ing] to cause an employer to discriminate against an individual in violation of [§ 623]." 29 U.S.C. § 623(c)(3). The Court has concluded that US Airways did not violate the ADEA by terminating the plaintiff's employment or refusing to petition for an exemption from the Age 60 Rule on the plaintiff's behalf; thus, the Union Defendants could not have "cause[d]" any such violation. And as the plaintiff's allegations of "collusion" between the Union Defendants and US Airways refer to those same activities by the airline, the Union Defendants could not have "attempt[ed] to cause" US Airways to violate the ADEA, either.

B.    Breach of Contract Claims

The plaintiff raises a separate claim against the Union Defendants for their purported breach of the CBA. Am. Compl. ¶¶ 95-101. As with his ADEA claims, the basis for this cause of action is the Union Defendants' alleged "perpetuat[ion of] a discriminatory retirement program for pilot members while spending [u]nion resources to negotiate deals to allow foreign pilots to continue working past age 60." Id. ¶ 99. Although the plaintiff does not specify which provisions of the CBA prohibit this alleged misconduct, he describes the alleged misdeeds of the Union Defendants as a "material breach of [the] ALPA's express and implied obligations under the [CBA]." Id. ¶ 100. The Union Defendants argue that the plaintiff's claims are without merit and cannot be adjudicated by this Court under the mandatory arbitration provision of the Railway Labor Act, ALPA Mem. at 12-13; ALPA Reply at 6-7; see also AFL-CIO Mem. at 3 (adopting the ALPA's arguments in their entirety), and the AFL-CIO further argues that the plaintiff's

claims should be dismissed against it because the ALPA and US Airways were the only

signatories of the CBA, AFL-CIO Mem. at 4-6.

      1.     <u>Breach of contract claim against the AFL-CIO</u>

As a threshold matter, the Court agrees with the AFL-CIO that it is not a proper party to

any breach of contract suit under the CBA. The document was only signed by representatives of

the ALPA and US Airways. AFL-CIO Mem., Ex. 1 (Excerpts from ALPA-US Airways

Collective Bargaining Agreement and ALPA-US Airways Letter of Agreement) at 4; <u>see also</u> <u>id.</u>

at 8 (bearing the signature of representatives from the same two entities on a subsequent letter of

agreement entered into by the ALPA and US Airways in 2004). Thus, any suit for breach of that

agreement must be directed towards those parties, not the AFL-CIO. <u>Cf.</u> <u>Sine v. Local No. 992,</u>

<u>Int'l B'hood of Teamsters</u>, 730 F.2d 964, 966 (4th Cir. 1984) (holding that provision in the Labor

Management Relations Act, 29 U.S.C. §§ 185-187 (2000), authorizing suits for breach of

collective bargaining agreements restricts such suits to "the parties to the contract"); <u>Loss v.</u>

<u>Blankenship</u>, 673 F.2d 942, 946 (7th Cir. 1982) (same); <u>Ramsey v. Signal Delivery Serv., Inc.,</u>

631 F.2d 1210, 1212 (5th Cir. 1980) (same); <u>Teamsters Local Union No. 30 v. Helms Express,</u>

<u>Inc.</u>, 591 F.2d 211, 217 (3d Cir. 1979) (same).

The plaintiff argues that the AFL-CIO is a proper party to his breach of contract suit

because "courts have held that international or regional unions can be held liable for the actions

of the local union if the local union was acting at its direction," Pl.'s Opp'n to AFL-CIO Mot. at

13, and "the evidence produced by the plaintiff shows that [the] ALPA was acting at the direction

of the AFL-CIO," <u>id.</u> at 14. But the "evidence" cited by the plaintiff refers to documents attached

to his opposition to the AFL-CIO's motion to dismiss, not to allegations set forth in his amended

complaint.  See Pl.'s Opp'n to AFL-CIO Mot. at 14 (arguing that "[a] review of the exhibits

attached to this opposition show that [the] ALPA and the AFL-CIO were very forthright about

presenting a 'unified' front on policy issues."); see also Am. Compl. ¶ 96 (alleging only that the

AFL-CIO "supported" the CBA between the ALPA and US Airways); AFL-CIO Reply at 6

("[The plaintiff] has attempted to remedy his deficient pleadings by resorting to factual evidence

appended to his [opposition] that is not included in the allegations of his [a]mended

[c]omplaint.").  "[T]he sparse case law addressing the effect of factual allegations in briefs or

memoranda of law suggests that such matters may never be considered when deciding a [Rule]

12(b)(6) motion."  Henthorn v. Dep't of Navy, 29 F.3d 682, 688 (D.C. Cir. 1994); see also

Taylor v. FDIC, 132 F.3d 753, 762 (D.C. Cir. 1997) (citing Henthorn for the proposition that

courts "may not draw upon facts from outside the pleadings" in resolving Rule 12(b)(6)

motions); Sindram v. Merriwether, 506 F. Supp. 2d 7, 10 (D.D.C. 2007) (Walton, J.) ("Factual

allegations in memoranda of law may not be considered when deciding a Rule 12(b)(6)

motion . . . .").

　　　　Even if the Court could consider the "evidence" adduced by the plaintiff in conjunction

with his opposition to the AFL-CIO's motion to dismiss, it would still have to conclude that the

plaintiff has failed to allege facts sufficient to hold the AFL-CIO vicariously liable for the

ALPA's alleged acts.  "It has long been established that a collective entity, including a labor

organization, may only be held responsible for the authorized or ratified actions of its officers

and agents."  Berger v. Iron Workers Reinforced Rodmen Local 201, 843 F.2d 1395, 1427 (D.C.

Cir. 1988) (internal quotations and citation omitted).  This "common-law agency

principle[] . . . provide[s] the appropriate analytical framework" for determining whether the

actions of a local union should be attributed to its parent.  Id.; accord Laughon v. Int'l Alliance of Theatrical Stage Employees, Moving Picture Technicians, Artists & Allied Crafts of the United States and Canada, 248 F.3d 931, 935 (9th Cir. 2001); Alexander v. Local 496, Laborers' Int'l Union of N. Am., 177 F.3d 394, 409 (6th Cir. 1999).  Thus, it is only "if the local engages in illegal conduct in furtherance of its role as an agent" of its parent union that the parent "will be liable for the local's actions."  Laughon, 248 F.3d at 935.

The plaintiff argues that the AFL-CIO should be held vicariously liable for the ALPA's actions on the basis of three factual assertions.  First, he asserts that "[the] ALPA has a direct link to the AFL-CIO web site."  Pl.'s Opp'n to AFL-CIO Mot. at 4.   Second, he claims that presidents of the ALPA also serve as vice-presidents of the AFL-CIO's Transportation Trades Department (the "TTD"), are members of the AFL-CIO Executive Counsel, and are vice-presidents of the AFL-CIO.  Id. at 4-5.  Third, he states that the TTD and the ALPA have jointly filed documents with public agencies in the past.  Id. at 5.

These assertions do not establish a principal-agent relationship between the AFL-CIO and the ALPA.  "It is a fundamental principle of hornbook agency law that an agency relationship arises only where the principal 'has the right to control the conduct of the agent with respect to matters entrusted to him.'"  Int'l Longshoremen's Ass'n, AFL-CIO v. NLRB, 56 F.3d 205, 213 (D.C. Cir. 1995) ("ILA") (quoting Restatement (Second) of Agency § 14 (1958)).  At a minimum,

> the relationship of principal and agent does not obtain unless the parent has manifested its desire for the subsidiary to act upon the parent's behalf, the subsidiary has consented so to act, the parent has the right to exercise control over the subsidiary with respect to matters entrusted to the subsidiary, and the parent exercises its control

in a manner more direct than by voting a majority of the stock in the subsidiary or making appointments to the subsidiary's Board of Directors.

Transamerica Leasing v. La Republica de Venezuela, 200 F.3d 843, 849 (D.C. Cir. 2000) (citing Restatement (Second) of Agency § 1 (1958)). "What should matter is not so much the [parent's] theoretical control over the local as the nature and extent of actual control." Laughon, 248 F.3d at 935 (internal quotation and citation omitted).

The plaintiff's assertions regarding the relationship between the AFL-CIO and the ALPA do not establish direct control by the AFL-CIO over the operations of the ALPA. His assertion that the ALPA maintains a link to the AFL-CIO's website does not even bear on the question of control, let alone resolve it. And his argument that the AFL-CIO must control the ALPA because they share common officers is no more persuasive than the notion that corporate subsidiaries must serve as agents of their parent companies if the subsidiaries' officers and directors hold similar positions with the parent company. See United States v. Bestfoods, 524 U.S. 51, 61 (1998) ("It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation (so-called because of control through ownership of another's corporate stock) is not liable for the acts of its subsidiaries." (internal quotation and citation omitted)). In both instances, the parent must "exercise[] its control in a manner more direct" to establish a principal-agent relationship. Transamerica Leasing, 200 F.3d at 849.

Finally, the plaintiff's argument that the close affiliation between the AFL-CIO and the ALPA on certain issues implies that one union is the agent of the other resembles arguments previously rejected in this Circuit and elsewhere. For example, in ILA the International Longshoreman's Association (the "ILA") "requested assistance from Japanese labor unions in its

24

dispute with two nonunion stevedoring companies engaged in Florida's citrus fruit export trade,"
prompting "two stevedoring companies and one neutral party" to file a complaint with the
National Labor Relations Board (the "NLRB").  ILA, 56 F.3d at 207.  The NLRB "held that the
ILA had violated the prohibition against secondary boycotts" set forth in the National Labor
Relations Act, 29 U.S.C. §§ 151-169 (2000), even though "the Japanese unions, not the ILA,
issued the threats that created the boycott . . . pursuant to a theory of agency law."  Id.  "Under
this theory, the [NLRB] held that the Japanese unions acted as the agents of the ILA merely
because the ILA requested the Japanese unions' actions and benefitted from the results of those
actions."  Id.  The District of Columbia Circuit reversed the NLRB's determination, concluding
that "the Japanese unions were in no sense the agents of the ILA."  Id. at 213.  In reaching its
decision, the court focused on the fact that "the ILA exercised no control over the conduct of the
Japanese unions," with the unions functioning as "completely independent entities, bound
together only by the fact that both seek to further the goals of organized labor worldwide."  Id.
"Discern[ing] nothing in the law of agency to support a theory transforming one union into the
agent of another based upon the spirit of labor solidarity alone," id., the court held that the NLRB
"erred in attributing the actions of the Japanese unions to the ILA" and remanded the case to the
NLRB for proceedings consistent with the court's decision, id. at 215.

The Eighth Circuit reached a similar conclusion in BE & K Constr. Co. v. United B'hood
of Carpenters and Joiners of Am., AFL-CIO, 90 F.3d 1318 (8th Cir. 1996).  In that case, a "non-
union merit shop construction contractor headquartered in Birmingham, Alabama  [('BE &
K')] . . . was hired by Potlatch Corporation ['Potlatch'] as the general contractor on a
construction project scheduled to begin in February [of] 1992 at the Potlatch Cypress Bend mill

in McGehee, Arkansas." BE & K, 90 F.3d at 1321.  When members of the Paperworkers

International Union (the "Paperworkers"), "an international union that represents in-plant

production and maintenance workers at paper mills throughout the United States," indicated that

BE & K's presence at the mill could create a problem because of the company's anti-union

tactics and "would likely attract the attention of the Carpenters[ and Joiners of America (the

'Carpenters'),] . . . a separate international union that represents workers in various trades and

crafts," id. at 1322, the president of Potlatch initiated a review of the company's contract with BE

& K that eventually led to the contract's termination, id. at 1322-23.  After the contract was

terminated, BE & K sued both the Paperworkers and the Carpenters, "claim[ing] that the unions

had engaged in unlawful secondary boycott activity . . . by using threats and coercion to force

Potlatch to cease doing business with BE & K."  Id. at 1323.

    "BE & K's claims against the Carpenters rel[ied] on an agency theory," with BE & K

arguing "that the cooperation of the Paperworkers with the Carpenters' national publicity

campaign [against BE & K] forged an agency relationship between the two unions."  Id. at 1326.

"To support its agency theory, BE & K relie[d] on evidence" demonstrating that (1) a national

publicity campaign against BE & K was directed by the Carpenters, (2) "the two unions formed a

national solidarity committee consisting of five or six representatives of each union," which had

"determined that the publicity campaign against BE & K was a top priority issue," and (3) "the

two unions jointly published various handbills and leaflets related to the BE & K campaign."  Id.

BE & K also pointed to a statement by one of the Paperworkers members "that the Carpenters

might come to the mill to picket and handbill" as well as a subsequent communication between a

Paperworkers member and the Carpenters as evidence that the Paperworkers were serving as

agents of the Carpenters when they expressed their concerns about BE & K to Potlatch's management.  Id. at 1326-27.

On appeal from a jury verdict in BE & K's favor with respect to both unions, the Eighth Circuit held that the Carpenters "were entitled to judgment as a matter of law" because BE & K's evidence was insufficient to support a finding that the Paperworkers acted as the agents of the Carpenters.  Id. at 1327.  Noting that "[t]he sort of cooperation in the spirit of labor solidarity undertaken in the campaign does not transform one union into the agent of another," id. at 1326, the Eighth Circuit refused to credit BE & K's evidence of a principal-agent relationship because that evidence did not "give rise to an inference of control," id. at 1327.  The Eighth Circuit therefore reversed the judgment against the Carpenters and dismissed the claims against it due to insufficient evidence.  Id. at 1332.

The plaintiff's assertions regarding prior joint filings by the AFL-CIO and the ALPA are of a piece with the arguments rejected by the District of Columbia Circuit in ILA and the Eighth Circuit in BE & K.  As with those cases, the missing element is control.  Regardless of how united the AFL-CIO and the ALPA might be with respect to any particular issue, there can be no principal-agent relationship absent some indication that the position of one of the entities was taken at the direction of the other.  Policy solidarity alone is simply "too frail" a link "to render one union the agent of another."  ILA, 56 F.3d at 208.

2.    Breach of contract claim against the ALPA

The Court also agrees with the ALPA that the plaintiff's breach of contract claims against it cannot be adjudicated by this Court as a result of the mandatory arbitration provision of the Railway Labor Act, which governs the CBA.  Under that statute, "disputes concerning the terms

27

of collective bargaining agreements fall into one of two categories." Ass'n of Flight Attendants, AFL-CIO v. USAir, Inc., 24 F.3d 1432, 1436 (D.C. Cir. 1994) ("USAir").  "The first relates to disputes over the formation of collective agreements or efforts to secure them," characterized as "major" disputes, whereas "[t]he second class" of "minor" disputes "contemplates the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one." Elgin, Joliet & E. Ry. Co. v. Burley, 325 U.S. 408, 723 (1945) ("Elgin").  "Major disputes are subject to a 'purposely long and drawn out' resolution process under the [Railway Labor Act]," USAir, 24 F.3d at 1436, while minor disputes "must be submitted to arbitration before a system board of adjustment for final and binding resolution," Ass'n of Flight Attendants, AFL-CIO v. United Airlines, Inc., 71 F.3d 915, 917 (D.C. Cir. 1995) (internal quotation and citation omitted).

The plaintiff's breach of contract claim against the ALPA is plainly a "minor" dispute subject to mandatory arbitration.  The plaintiff repeatedly alleges that the ALPA "breach[ed]" its contractual obligations, not that those obligations must be altered or created in the first instance. Am. Compl. ¶¶ 113-15.  Because his claim "relates either to the meaning or proper application of a particular provision with reference to a specific situation," Elgin, 325 U.S. at 723, the plaintiff must resolve his breach of contract claim against the ALPA "through mandatory and binding arbitration before the National Railroad Adjustment Board," US Air, 24 F.3d at 1436.  The claim must therefore be dismissed.[13]

---

[13] Because it is plain from the face of the plaintiff's amended complaint that his breach of contract claim against the ALPA must be dismissed as a "minor" dispute subject to mandatory arbitration for purposes of the Railway Labor Act, see supra n.7, the Court need not decide whether that provision is an affirmative defense or a limitation on this Court's subject-matter jurisdiction under the Railway Labor Act. See Lindsey v. United States, 448 F. Supp. 2d 37, 50-54 (D.D.C. 2006) (Walton, J.) (discussing the differences between affirmative defenses

(continued...)

## IV. Conclusion

It is not "a proper function of a federal court to serve as a forum for 'protests,' to the detriment of parties with serious disputes waiting to be heard."  Saltany v. Reagan, 886 F.2d 438, 440 (D.C. Cir. 1989).  In this case, it is clear that the plaintiff's true complaint lies with the merits of the Age 60 Rule, not the companies or unions that were subject to that rule. Accordingly, his allegations do not suffice to state a claim for breach of the ADEA, breach of fiduciary duty, or breach of contract by any of the defendants.  The Court must therefore grant the defendants' motions and dismiss the plaintiff's amended complaint in its entirety.

**SO ORDERED** this 4th day of March, 2008.[14]

REGGIE B. WALTON
United States District Judge

---

[13](...continued)
provided by Congress that are "jurisdictional" and those that are not).

[14]  An order granting the defendants' motions to dismiss and dismissing the plaintiff's amended complaint in its entirety follows.  The Court will defer closing this case only until it has resolved the AFL-CIO's motions for sanctions.